**Callanan v. Johnson**

C.P. of Allegheny County, no. FD 04-2203-003.

*Margaret P. Joy,* for plaintiff.
*Joel M. Dresbold,* for defendant.

WECHT, *J.,* March 31, 2006—Both parties appeal from this court's January 4, 2006 order dismissing defendant Eric Y. Johnson (Husband)'s exceptions and plaintiff Susan G. Callanan (Wife)'s cross-exceptions. The parties excepted to the recommendations of Hearing Officer Joseph Kulik, Esquire, mailed on September 30, 2005. Hearing Officer Kulik conducted a hearing on Husband's petition to modify his alimony and medical insurance reimbursement obligations to Wife, and on Husband's ongoing contempt for failure to comply with those obligations.

## BACKGROUND AND PROCEDURAL HISTORY

The parties married in New York on June 19, 1971. The parties divorced by decree of the Massachusetts Probate Court, Nantucket, entered on June 17, 1998. On May 21, 1998, prior to entry of the decree, the parties entered into a "separation agreement." The agreement provided, inter alia, that Husband pay alimony to Wife, until Wife's death or remarriage, in the amount of $4,300 per month. (Agreement, exhibit C, ¶¶2, 3.) The agreement also required Husband to reimburse Wife for the cost of medical insurance coverage for Wife until Wife's remarriage, or until the time that Wife becomes eligible to receive health insurance benefits under the Medicare plan. (Agreement, exhibit A, ¶3.)

On May 3, 2004, Wife filed a "complaint in support" against Husband in Allegheny County. At that time, Husband was residing in Sewickley, and Wife was residing in New York.[1] By administrative order of this court dated May 25, 2004, the Massachusetts order, which implemented the terms of the parties' agreement, was registered and confirmed in Allegheny County. The May 25 order stated that the amount of arrears as of April 19, 2004 was $25,800.

At the September 23, 2005 hearing before Hearing Officer Kulik, Husband testified as follows with regard to his educational background and employment history:

---

[1]. At the time of hearing before Hearing Officer Kulik, when asked for his current address, Husband provided an address in Fort Orange, Florida. (9-23-05 R. at 12.) Wife testified that she resides in New York City. (9-23-05 R. at 59.)

Husband graduated from Yale University. (9-23-05 R. at 36.) During the marriage, Husband was employed by Heinz Company in Pittsburgh. (9-23-05 R. at 36.) During his tenure at Heinz, Husband worked in various capacities, including product manager, head of marketing, head of corporate planning, and, ultimately, director of international corporate development. (9-23-05 R. at 35.) In 1989, Husband left his employment with Heinz. (9-23-05 R. at 37.) While Husband stated that his job was "discontinued," he admitted that he was offered the opportunity to remain at Heinz in a different capacity. (9-23-05 R. at 37.) Husband's salary at the time he left Heinz was approximately $150,000. (9-23-05 R. at 37.)

In 1989, following his departure from Heinz, Husband started his own business, Certified Pure Ingredients (CPI). (9-23-05 R. at 39.) Husband described the business as focusing on "specialty ingredients for the food and beverage industry." (9-23-05 R. at 14.) At the time of the agreement, Husband was the president and controlling shareholder of his company. (9-23-05 R. at 14.) Husband's 1998 W-2 reflected income of $144,000. (9-23-05 R. at 14.) Husband's actual income was closer to $200,000 after inclusion of perquisites. (9-23-05 R. at 14.)

Husband testified that his business suffered a downturn following the United States International Trade Commission's imposition of special anti-dumping duties in 2001 against the main products made by his company. (9-23-05 R. at 15-16.) Husband stated that the imposition of the duties reduced the company's profit margin from 15 percent to 8.5 percent. (9-23-05 R. at 16.) Further, the company's secured lender reacted to the reduction of the company's cash flow by tightening the company's

credit line, thus limiting the amount of working capital. (9-23-05 R. at 16-17.) As a result, in 2002, Husband testified that "I reduced my income by about $2,000 a month simply to try to offset some of the duty payments that were being incurred and also to pay for the addition of a qualified chief financial officer to help me manage the business as it grew." (9-23-05 R. at 18-19.)

Husband admitted that, beginning around August or September 2003, he started defaulting on his alimony payments to Wife. (9-23-05 R. at 20.) Husband also admitted that he began defaulting on the medical insurance reimbursement payments "around the same time." (9-23-05 R. at 43.) In May 2004, on behalf of CPI, Husband filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. Husband also filed a personal bankruptcy. In August 2004, Wife petitioned for relief from the automatic stay in the United States Bankruptcy Court. By order dated August 19, 2004, the Bankruptcy Court granted Wife's requested relief.

On October 14, 2004, Wife presented a "petition for contempt and sanctions for failure to make required alimony payments" before the undersigned. By order of the same date, this court scheduled a hearing for November 24, 2004. Husband failed to appear for the November 24 hearing. As a result, a high priority bench warrant issued, and Husband appeared on November 30, 2004 before the Honorable Eugene F. Scanlon Jr. Judge Scanlon set purge conditions requiring Husband to pay $14,000 and to continue to pay his obligations pursuant to the agreement. Judge Scanlon scheduled a compliance review on December 9, 2004 before Hearing Officer Annette Tierney Esquire.

In her December 9 recommendations, Hearing Officer Tierney recommended that judgment be entered in favor of Wife in the amount of $41,900, which did not include the charge for December 2004. Hearing Officer Tierney further recommended that Husband pay counsel fees to Wife in the amount of $1,536. Wife filed exceptions to Hearing Officer Tierney's recommendations, which were dismissed by the undersigned by order dated April 14, 2005.

On December 17, 2004, Husband presented a petition before the undersigned seeking to modify his alimony and medical insurance reimbursement obligations based upon a change in circumstances. Upon consent of the parties, the hearing on Husband's petition was continued from April 8, 2005 to September 23, 2005 to allow for discovery. Following hearing on September 23, Hearing Officer Kulik entered recommendations on September 30, 2005 denying Husband's petition and finding him to be in contempt of the agreement. Hearing Officer Kulik recommended judgment in the amount of $82,583.78 as of September 30, 2005. In his explanation, Hearing Officer Kulik concluded that the agreement could not be modified under Massachusetts law. Further, Hearing Officer Kulik stated that, even if the agreement were modifiable under Massachusetts law, modification was not appropriate based upon the facts of the case. Specifically, Hearing Officer Kulik noted that Husband has the ability to earn income and found it "troubling" that Husband acknowledged that he can control his own income from his business.

On October 11, 2005, Husband filed timely exceptions to Hearing Officer Kulik's recommendations. Wife filed cross-exceptions on October 21, 2005. Following oral

argument on November 18, 2005, this court entered its January 4, 2006 order dismissing both sets of exceptions, from which both parties appeal.

## Husband's Appeal

On February 1, 2006, Husband filed a notice of appeal from this court's January 4, 2006 order at 265 WDA 2006. By order of the same date, this court directed Husband to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On February 13, 2006, Husband filed his concise statement raising the following issues for review:

"(1) The lower court erred in denying the defendant's exceptions to the recommendation of the hearing officer that Massachusetts law did not allow modification of alimony in this case even though the parties specified in their separation agreement that the agreement was to be incorporated and merged into a divorce judgment.

"(2) The lower court erred in denying the defendant's exceptions to the recommendation of the hearing officer that the evidence did not prove a material change in circumstances sufficient to reduce the defendant's alimony order even though the uncontroverted testimony showed the defendant had a drastic reduction in his income through no fault of his own.

"(3) The lower court erred in denying the defendant's exceptions to the recommendation of the hearing officer finding the defendant in contempt and setting purge conditions when there was no evidence that the defendant had the present ability to comply with the purge conditions."

*Wife's Cross-Appeal*

On February 14, 2006, Wife filed a cross-appeal from this court's January 4, 2006 order at 346 WDA 2006. On February 15, 2006, this court issued an order directing Wife to file a concise statement of matters complained of on appeal in accordance with Pa.R.A.P. 1925(b). In her concise statement, filed on February 23, 2006, Wife presents the following issues for review:

"(1) The court below erred in determining the cost of plaintiff Wife's medical insurance premium which defendant Husband is obligated to pay/reimburse her for.

"(2) The court below erred in calculating the arrears owing to Wife for Husband's failure to pay/reimburse for the appropriate medical insurance premiums.

"(3) The court below erred in failing to award to Wife the full amount of her counsel fees incurred solely in attempting to compel Husband's compliance with prior orders of court."

## DISCUSSION

*Husband's Appeal*

As to Husband's first issue raised on appeal, this court notes that the parties contracted for Massachusetts law to govern their agreement. Specifically, the preamble to the agreement, section XI, provides that, "This agreement shall be construed and governed according to the laws of the Commonwealth of Massachusetts."

Husband has maintained the position that the parties' agreement is modifiable under Massachusetts law. Husband asserts that, under Massachusetts law, where a

separation agreement is incorporated and merged into a divorce decree, the agreement is treated as a court order, and thus the standard for modification is a "material change in circumstances." See *Freeman v. Freeman,* 557 N.E.2d 1386 (Mass. App. Ct. 1990.) Husband's statement of the law is accurate. Further, Husband's assertion that the parties agreed that they would *request* that the agreement be incorporated and merged into the divorce judgment is accurate. (See agreement, preamble, section VII.) However, the parties' judgment of divorce nisi provides as follows:

"Agreement dated May 21, 1998 and addendum to separation agreement dated June 17, 1998 which are hereby incorporated *but not merged* into said judgment nisi, notwithstanding said incorporation, and said agreement and addendum shall survive and remain as an independent contract except for child-related issues which shall merge." (emphasis added)

Accordingly, the agreement survives the divorce judgment as an independent contract.

Massachusetts courts have held that, where a separation agreement is fair and reasonable when the divorce judgment was entered, was not the product of fraud or coercion, and was incorporated but not merged into the divorce judgment, "something more than a 'material change of circumstances' must be shown before a judge of the probate court is justified in refusing specific enforcement of that agreement." *DeChristofaro v. DeChristofaro,* 508 N.E.2d 104, 108 (Mass. App. Ct. 1987), citing *Stansel v. Stansel* 432 N.E.2d 691 (Mass. 1982); *Knox v. Remick,* 358 N.E.2d 432 (Mass. 1976).

The *DeChristofaro* court provided the following guidance as to the definition of "something more":

"'Something more' has been characterized as 'countervailing equities,' such as where one spouse 'is or will become a public charge,' where there has been failure to comply with the agreement, or where there are equally compelling reasons." *DeChristofaro,* 508 N.E.2d at 108, quoting *Knox,* 358 N.E.2d 435-36; *Stansel,* 432 N.E.2d at 515-16.

Further, the *DeChristofaro* court noted that, in circumstances where the court finds that "something more" exists, the court may order payment in excess of the obligation specified in the parties' separation agreement. See *id.*

In the instant case, the judgment of divorce nisi specifically stated: "The court finds said agreement to be fair and reasonable and not the product of fraud or coercion." Further, the Massachusetts judgment expressly ordered that the parties' agreement survived the divorce "as an independent contract."

Accordingly, at hearing on his modification petition, Husband had the burden to show that something more than a material change of circumstances occurred in order for his petition to be granted. Husband did not meet that burden. There was no evidence that either spouse will become a public charge. Further, in *Knox,* the Supreme Judicial Court of Massachusetts noted that a court might deny specific performance of an agreement where the plaintiff failed to comply with some other provision of the agreement. In this case, Husband presented no evidence that Wife has failed to comply with the agreement in any way. Rather, by his own admission, Husband

stopped paying his alimony and medical insurance reimbursement obligations in or about August 2003. In addition, at hearing, Husband admitted that, in May 2005, he surrendered the life insurance policy that he was required to maintain to secure his alimony obligation pursuant to the agreement. (9-23-05 R. at 44-45.) Because Husband failed to demonstrate that something more than a material change in circumstances had occurred, Hearing Officer Kulik properly enforced the agreement, and this court properly entered the hearing officer's recommendations as a final order.

With regard to Husband's second issue on appeal, as already discussed, Husband was required by the governing Massachusetts law to show something more than a material change in circumstances. However, even if Husband was required to show only a material change in circumstances, the evidence still would support the hearing officer's conclusion that Husband did not meet this requirement. Indeed, the evidence demonstrated that the reduction in Husband's income is voluntary.

Husband testified that when CPI started to go downhill following imposition of the anti-dumping duties, *Husband,* in his capacity as president and controlling shareholder of his company, reduced his income. (9-23-05 R. at 14.) At the time of the agreement in 1998, Husband's income was about $200,000, including perquisites. (9-23-05 R. at 14.) Husband testified that he began reducing his income in 2002. (9-23-05 R. at 14.) Husband's 2002 W-2 reflected income of $61,000. (9-23-05 R. at 20.) Husband's 2003 W-2 reflected income of $60,000. (9-23-05 R. at 20-21.) In 2004, following Husband's filing of bankruptcy on behalf of CPI, Husband earned $10,000 from CPI and $15,000 from a spin-off of CPI called

Certified Pure Ingredients Sales, LLC. (9-23-05 R. at 22, 27.)

Further, in stark contrast to Husband's statement in his second issue that the reduction of his income was "through no fault of his own," Husband admitted that he had made business mistakes in running CPI that led to a "heavy debt load" that "had to be paid for."[2] (9-23-05 R. at 40-41.) Husband also admitted that he had not sought full-time or even part-time employment with companies other than Organic Ingredients and Vita Food since his business had filed for bankruptcy. (9-23-05 R. at 41.)

Husband testified as follows concerning his employment following the bankruptcy filing on behalf of CPI:

From May through August 2004, the chief financial officer of CPI, Mr. Whitehead, started CPI Sales "to basically resuscitate and carry on what business we could." (9-23-05 R. at 22.) Mr. Whitehead was unable to secure financing for CPI Sales, and decided to either close the company or sell it. Ultimately, Husband's wife, Paula, bought CPI Sales for a dollar. (9-23-05 R. at 22.) Husband received $15,000 in commission income from CPI Sales in 2004. (9-23-05 R. at 23.) Yet Husband denied being a shareholder, employee or manager of CPI Sales. (9-23-05 R. at 22-23.)

In November 2004, Husband entered into a five-year contract with Organic Ingredients. (9-23-05 R. at 23, 24.) Organic Ingredients paid Husband $10,000 up front for

---

2. On cross-examination, Husband admitted that $1,776,000 in unsecured debt and $333,000 in secured debt had been listed on the schedules attached to the CPI bankruptcy petition. (9-23-05 R. at 53-54.)

the "intellectual property" represented by Husband's relationship with suppliers. (9-23-05 R. at 24.) Organic Ingredients agreed to pay Husband a commission rate of 20 percent of the gross margin that Organic Ingredients earned from the sale of products that Husband brought to it. (9-23-05 R. at 24.) Organic Ingredients also agreed to pay off about $160,000 of debts incurred by CPI Sales. (9-23-05 R. at 24.) Husband explained that Organic Ingredients agreed to pay this debt because "the suppliers who the debt was owed to were essential to the continued operation of [Organic Ingredients]." (9-23-05 R. at 24.) It is unclear why Organic Ingredients would be concerned with debt of a company of which Husband denies being a shareholder, employee or manager. As of the time of the September 2005 hearing, Husband had earned $42,000 gross year-to-date from Organic Ingredients. (9-23-05 R. at 25.) However, Husband explained that Organic Ingredients takes 35 percent of his gross earnings as repayment for the obligations they have satisfied on behalf of CPI Sales. (9-23-05 R. at 25, 42.)

Husband also has a contract with Vita Foods, which is a company based in Chile. (9-23-05 R. at 25.) Vita Foods pays Husband three percent of the value of whatever business Husband brings them. (9-23-05 R. at 25.) Husband stated that the contract with Organic Ingredients has "tight exclusivity provisions" that prevent him from obtaining contracts with competitors. (9-23-05 R. at 26-27.) Husband explained that he has been able to obtain the contract with Vita Foods because the company is not a competitor of Organic Ingredients. (9-23-05 R. at 25-27.) As of the September 2005 hearing, Husband had made about $9,000 from his contract with Vita Foods. (9-23-05 R. at 26.)

Husband admitted on cross-examination that he had not sought employment as an employee with any other company either before entering into the contract with Organic Ingredients or after. (9-23-05 R. at 41-42.) On redirect, Husband explained that he did not return to traditional employment with companies such as Heinz or Del Monte because he had hoped that CPI Sales would become a "very lucrative" business. (9-23-05 R. at 58.) Then, when CPI Sales supposedly did not become very lucrative, Husband thought the contract with Organic Ingredients "would be an acceptable solution." (9-23-05 R. at 58.) Finally, Husband claimed that he would not get too far in an interview with his credit report showing two foreclosures and a bankruptcy, and he "really wanted to spare [himself] that humiliation." (9-23-05 R. at 58-59.) The foregoing evidence demonstrates that any reduction in Husband's income was voluntary, and that Husband's second appellate issue accordingly lacks merit.

As to Husband's third issue raised on appeal, Hearing Officer Kulik made the following finding regarding Husband's ability to pay:

"I find it somewhat curious that Deft has been in a position of control and influence, yet his company, in effect 'he,' is limiting his income. There was substantial testimony as to the use of business funds by Deft and his wife. There were cash withdrawals and other transactions, for example. It is clear Deft has the ability to earn income, and I find his claims of financial hardship to be disingenuous. Since the alimony is not modifiable, and since Deft has had the ability to work, earn money, and pay, relief herein is appropriate [sic]." (9-30-05 recommendations, p. 2.)

Indeed, despite Husband's testimony that CPI Sales had been "dormant" since October 2004, as well as his denial that he was ever a shareholder or employee or had a management contract with CPI Sales, Husband freely admitted on cross-examination that he and his wife (the owner of CPI Sales) had access to, and drew funds from, the CPI Sales bank account right through the date of hearing. (9-23-05 R. at 23, 48-52.)

When confronted with the specific transactions, Husband admitted that funds from the CPI Sales bank account were used to pay the Comcast and Duquesne Light bills for Husband's Sewickley office. (9-23-05 R. at 49-50.) The account also was used to make monthly payments on an Advanta credit card on which Husband testified CPI Sales had incurred a $3,600 balance. (9-23-05 R. at 50.) Husband also identified a $4,200 wire transfer from the CPI Sales bank account as a transfer he made to pay the movers upon their arrival with Husband's possessions in Florida. (9-23-05 R. at 52.) Yet Husband also testified that his mother loaned him money to cover the costs of his move to Florida. (9-23-05 R. at 47.)

As to deposits into the CPI Sales bank account, Husband identified a deposit of $4,625 on May 18, 2005 as the proceeds from his surrender of the life insurance policy that Husband was required to maintain to secure his alimony obligation pursuant to the agreement. (9-23-05 R. at 50.) It was evident that these funds could have been used by Husband to pay his obligation to Wife. Husband also identified deposits into the CPI Sales account from Alla Foods, which Husband said is the Chilean name for Vita Foods. (9-23-05 R. at 51.) Husband offered no explanation as to why the money he was re-

ceiving from his contract with Vita Foods was being deposited into the CPI Sales bank account.

Husband also testified that he has received loans from family members over the past two years, which suggests that Husband has additional financial resources. In addition to the loan from his mother to cover Husband's move to Florida, Husband received a total of $9,000 from his father in May and June 2005 to cover living expenses, and a $31,000 loan from his sister-in-law. (9-23-05 R. at 46-47.) Husband received the loan from his father *after* a proceeding in March 2005 at which he testified that his father had disowned him. (9-23-05 R. at 47.) Husband explained that $14,000 of the $31,000 loan from his sister-in-law went toward the purge payment that Husband was required to make pursuant to Judge Scanlon's November 30, 2004 order. (9-23-05 R. at 46.) Husband could not say where the other $17,000 went, other than to say that he is "$2,000 a month under water on what it costs me to live."[3] (9-23-05 R. at 47.) Husband's assertions that there was "considerable lender fatigue" among his family members and that his mother and father were seeking immediate repayment appeared to be disingenuous. (9-23-05 R. at 57.)

The foregoing evidence demonstrated that Husband had the ability to pay his obligation to Wife.

---

3. Despite Husband's complaints as to his high cost of living in Florida, when asked why he moved to Florida, Husband stated that he not only wanted to get the "bad taste" of the bankruptcy out of his mouth, but that he wanted to "rebuild" himself in a "lower cost area." (9-23-05 R. at 31-32, 47, 52-53.)

*Wife's Appeal*

With regard to the first issue Wife raises in her cross-appeal, Hearing Officer Kulik offered the following explanation concerning determination of the cost of Wife's medical insurance coverage:

"Neither party offered any testimony as to the cost for such coverage, but there was uncontradicted testimony that the parties had acted under the premise that this would cost $500 per month. Plaintiff says it now costs more, but she has not adequately proven such a claim. It is her duty to present the evidence. I am using the $500 figure for the cost of insurance." (9-30-05 recommendations, p. 2.)

At hearing, Wife testified that she had been accepting $500 per month from Husband as reimbursement for her medical insurance coverage, but that the cost is actually $548.75. (9-23-05 R. at 62-63.) Because Wife did not introduce any documentation to support her assertion that her medical insurance cost is $548.75, it was unclear whether Wife was testifying that the cost had at one time been $500 and had risen to $548.75, or if the cost had been $548.75 all along. Without this evidence, it was impossible for the hearing officer to determine the period of time that the cost had been $548.75 for purposes of calculating the arrears. Accordingly, the hearing officer properly used the $500 figure.

As to Wife's second issue raised on appeal, the hearing officer stated in his explanation that he had calculated a total arrears for the medical insurance reimbursement of $6,500 after reviewing the entire file and record. The hearing officer was not required simply to accept Wife's testimony that the figure was $14,000. (9-23-05 R. at

62.) Rather, Hearing Officer Kulik properly conducted an independent review of the file to calculate the $6,500 figure.

With regard to Wife's final issue on appeal, Wife requested the entirety of the $20,124 in counsel fees that she incurred while the law firm of Weisman Goldman Bowen & Gross, LLC had been representing her. (9-23-05 R. at 69, 95.) In awarding Wife $2,500 in counsel fees, the hearing officer noted that "[i]t appears that some of the invoice charges would not be includible . . . ."

Indeed, included on Wife's invoice were fees incurred in representing Wife's interests in the United States Bankruptcy Court. In disposing of Wife's previous exceptions by its April 14, 2005 order, this court already had determined that it does not have jurisdiction to award Wife counsel fees for work done in bankruptcy court. Moreover, the hearing officer has discretion in determining the award of counsel fees, and is not required to recommend an award equal to the amount that a party is requesting.

For the foregoing reasons, this court's January 4, 2006 order should be affirmed.